HANSON BRIDGETT LLP
MATTHEW MILLER, SBN 172661
mmiller@hansonbridgett.com
BREANA L. BURGOS, SBN 335077
bburgos@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:    (415) 777-3200
Facsimile:    (415) 541-9366

Attorneys for Plaintiff CHRIS VOLZER

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRIS VOLZER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ASTRONAUT, INC., a Delaware corporation; AYOOLA JOHN-MUYIWA, an individual; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR**<br>**(1) RETALIATION**<br>**(2) WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY**<br>**(3) NEGLIGENT HIRING, SUPERVISION, AND RETENTION;**<br>**(4) INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff CHRIS VOLZER ("Volzer") alleges as follows:

## INTRODUCTION

1. This matter concerns betrayal, retaliation, abuse of corporate power, and self-admitted malfeasance by a company founder. Plaintiff CHRIS VOLZER ("Volzer"), a co-founder and dedicated contributor to Astronaut, Inc., was terminated by his co-founder Ayoola John-Muyiwa ("AJ") after Volzer discovered and revealed AJ's squandering of precious corporate funds on personal expenses, cryptocurrency and whims—financial abuse immediately admitted by AJ but then swept under the rug. Realizing that Volzer would soon expose the financial malfeasance or force AJ's ouster, or both, AJ weaponized his leadership position and Board relationships to silence Volzer's dissent and terminate him for trumped up, specious reasons.

Case No.

COMPLAINT

2. Volzer's termination was not only unlawful—it was a calculated act of vengeance designed to punish him for speaking out, for demanding accountability, and for refusing to be complicit in AJ's reckless and self-serving behavior.

## PARTIES

3. Plaintiff CHRIS VOLZER ("**Volzer**") is an individual residing in Massillon, Ohio, and was, at all relevant times, an employee, shareholder, and co-founder of Astronaut, Inc.

4. Defendant ASTRONAUT, INC. ("**Astronaut**") is a Delaware corporation doing business in California with its principal place of business in San Francisco during the relevant time period.

5. Defendant AYOOLA JOHN-MUYIWA ("**AJ**") is an individual residing in Houston, Texas and was, at all relevant times, Chief Executive Officer of Astronaut, Inc.

6. Plaintiff is unaware of the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, and will amend this Complaint when their identities are ascertained.

## JURISDICTION AND VENUE

7. The Court has jurisdiction over all the causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000.00 and there exists complete diversity between Plaintiff and Defendants. Plaintiff Christopher Volzer resides in Massillon, Ohio. Defendant Astronaut, Inc. is incorporated in Delaware with a principal place of business in California. Defendant Ayoola John-Muyiwa resides in Houston, Texas.

8. This Court has personal jurisdiction over Astronaut, Inc. because a substantial part of the events giving rise to the allegations contained in this Complaint occurred in San Francisco, the acts alleged in this Complaint were targeted at a corporation headquartered and operating in California, and Astronaut, Inc. purposely availed itself of the privilege of conducting business in the State of California such that the claims advanced against it arise out of Astronaut, Inc.'s contact with Christopher Volzer in the State of California, and thus the exercise of personal jurisdiction is reasonable.

9. This Court has personal jurisdiction over Ayoola John-Muyiwa because a

substantial part of the events giving rise to the allegations contained in this Complaint occurred in San Francisco, the acts alleged in this Complaint were targeted at a corporation Ayoola John-Muyiwa operated in California, and Ayoola John-Muyiwa purposely availed himself of the privilege of conducting business in the State of California such that the claims advanced against him arise out of his contact with Christopher Volzer in the State of California, and thus the exercise of personal jurisdiction is reasonable.

## DIVISIONAL ASSIGNMENT

10. Pursuant to Civil L.R. 3-2(c), this case may be properly assigned to the San Francisco (or, less preferably, Oakland) Division of the Northern District of California because a substantial part of the events or omissions giving rise to the claims herein occurred in the City and County of San Francisco, California.

## GENERAL ALLEGATIONS

**I.  VOLZER AND AJ FORGE A BOND TO BUILD AN INNOVATIVE COMPANY FOSTERING CONNECTIONS.**

11. Volzer first met AJ at a startup called Faves around August 2021. AJ led the product team and Volzer led the engineering team. The two collaborated for several months and built a strong working relationship. Eventually, they both left Faves to pursue different jobs in February 2022, but they kept in touch.

12. In December 2022, Volzer and AJ met up while both were taking separate trips in Mexico. They discussed working together again. Volzer thought AJ showed a lot of promise and told him he would happily support AJ as a co-founder. From the outset, Volzer was optimistic and told AJ he saw his potential as a founder. The two decided to start Astronaut together with AJ as the Chief Executive Officer and handling the administrative aspects of the company while Volzer would lead engineering and product development.

13. Astronaut was initially conceptualized to combat the loneliness epidemic spurred by the COVID pandemic and its resulting social isolation issues. Volzer and AJ sought to build a product that made it easier for people to connect with one another by introducing them to others based on shared interests and social similarities.

14. Per Astronaut's founding documents, AJ worked as the Chief Executive Officer, Director, President, Chief Financial Officer, Treasurer, and Secretary.

15. In the Spring of 2023, Volzer and AJ had the chance to interview for an accelerator—meant to help startups grow rapidly through offering seed money—in San Francisco if they were able to quickly produce a prototype. The prototype would match members of a Discord server—a virtual community space where people can chat, share content and collaborate—with other members who had shared interests and then connect them through a video chat feature.

16. Volzer spent several intense days coding, working nonstop from the moment he arrived in San Francisco.

17. Although Volzer and AJ did not end up getting into the accelerator, in the process they were able to secure funding and decided to quit their respective jobs to pursue Astronaut full time. The pair moved into AJ's brother's house in Houston, Texas to work together in person.

18. Between June 2023 and October 2023, Volzer worked on Astronaut's next product. The product was a production-ready version of the prototype pitched to the accelerator. The production-ready version would connect members within the Discord server and then provide them with a custom scheduler to arrange video calls with like-minded members, then launch into a tailored video chat experience.

19. During this time, early tensions arose regarding finances. AJ made several equipment purchases, spent excessive money on Ubers, and made several other strange purchases without discussing these expenditures with Volzer.

20. Volzer raised this issue with AJ and they both agreed not to upgrade any flights and to be more mindful of the expenses. Unfortunately, AJ did not honor this agreement for long.

21. AJ abruptly decided Astronaut would abandon the Discord server-oriented product. Ironically, after AJ attended a single conference and failed to sell the product, he decided Astronaut should pivot to a new project. This was a contentious conversation at the time, as Volzer believed AJ did not put in enough effort to sell the product Volzer worked so hard to create.

22. But committed to making Astronaut successful, Volzer began development on yet another product. This version functioned as a ChatGPT-style interface built for Astronaut's customers' data. The product had a conversational interface that let customers ask questions about what other members were discussing.

23. To execute this version, Volzer and AJ then decided to move from Houston to San Francisco.

24. Meanwhile, AJ was supposed to be responsible for sales but appeared to put in minimal effort towards generating revenue. Despite setting daily outreach and sales milestones, little progress was made until Astronaut hired Victoria Liang as the Head of Growth.

25. Between May 2024 and October 2024, the team expanded with the addition of Liang. Astronaut also hired another engineer and a designer.

26. Product development continued, but tensions mounted as AJ was often absent and communicated poorly with the team. Liang and the designer both raised concerns about AJ's dismissive communication style. Eventually, Astronaut let the designer go after repeated conflicts with AJ and stalled output.

27. During 2024, AJ attended multiple conferences but failed to generate leads. For example, he attended a conference in Paris where he failed to come back with leads but did spend a day at the Louvre. He had a habit of talking to companies outside of Astronaut's target market—such as luxury goods conglomerate LVMH and an oil company in Houston—wasted efforts with which Volzer did not agree. In hindsight, AJ was likely doing this for his own personal influence gain.

28. In 2024, Astronaut's sales were only $1000 to $2000 despite all of AJ's so-called "business" trips.

29. By the end of 2024, AJ once again started pitching investors on a new product direction. This new product would function as a data platform for online communities, providing analytics and reporting tools, along with data syncing for Discord, Slack, and Telegram.

30. Once again, AJ sought to pivot the company toward a new direction while Volzer was left to solve customer needs. Where Volzer tried to focus on learning from users, AJ kept

trying to pursue his personal vision without incorporating any consumer feedback.

## II. VOLZER UNCOVERS AJ'S SUBSTANTIAL FINANCIAL ABUSE AND MISDEEDS.

31. On January 15, 2025, Volzer uncovered a stunning pattern of financial abuse by AJ while reviewing Astronaut, Inc.'s 2024 corporate expenses. Astronaut used a software called "Gusto" to handle payroll and Mercury as its checking account. While reviewing Gusto in the usual course of business, Volzer discovered the Gusto transactions listed in the Mercury checking account were unusually high. Volzer knew there were not any normal business transactions that would cause this discrepancy. Volzer then cross-referenced these charges with the company's expenses in Gusto.

32. As Volzer dug further, he learned that AJ, his co-founder and partner, had been treating the company's bank account like his personal piggy bank—charging thousands of dollars in blatantly personal and frivolous purchases. Volzer identified three main categories of egregious spending:

   a. **Personal indulgences** like a $1,800 video game bundle, NFTs traceable to AJ's personal wallet, and $15,200 in digital cameras never used for company business. On information and belief, AJ specifically purchased the cameras for his personal photography hobby.

   b. **Suspicious "business" purchases** including three computers and three phones bought within months of each other—none of which were justified by operational need nor seemingly deployed at the company's San Francisco workspace. In fact, when Victoria Liang, Astronaut's Head of Growth, joined the company several months prior she was not able to buy a work laptop in order to save on expenses.

   c. **Destructive spending** such as upgraded flights, excessive Uber rides, and lavish trips to Dubai and Paris that cost thousands and yielded zero business leads. On information and belief, many of the upgraded flights were for trips that were personal and not work-related. On information and belief, AJ often disguised these trips as business travel, claiming to have meetings scheduled, when in reality he was flying either to his Texas hometown or to Atlanta, where his girlfriend's family lived.

33. Volzer next contacted Victoria Liang, Astronaut's Head of Growth, to verify whether any of these purchases had legitimate business use. Liang specifically confirmed she had never even seen the digital cameras—one of the most expensive items AJ had charged to the company.

34. As Volzer dug deeper, the financial misconduct became even more outrageous. AJ had charged: $6,000 in cryptocurrency purchases linked to NFTs; three luxury hotel stays in Lagos, Nigeria; new Pirelli tires for a *rental* car; three computers and three phones in rapid succession; a $700 espresso machine; and a staggering 191 Uber transactions totaling $6,669 in 2024 alone.

35. These were not isolated incidents—they were part of a sustained campaign of self-enrichment at the company's expense. Astronaut was bleeding cash, spending $50,000–$70,000 monthly while generating less than $2,000 in revenue. By December 2024, the company had less than $500,000 in the bank. AJ's spree occurred before Astronaut raised an additional $1.6 million—he was looting the company while it teetered on the edge of insolvency. In fact, AJ had lamented to Volzer that Astronaut was running out of funds all while he secretly drained the coffers.

36. This was the moment Volzer realized the depth of AJ's betrayal. He immediately texted AJ and demanded a conversation.

37. During a fifteen-minute phone call on or about January 15, 2025, AJ admitted the charges were personal. He justified them by saying he "deserved it" and even encouraged Volzer to do the same and "buy whatever you want." He apologized, acknowledged he had broken Volzer's trust and admitted he had acted selfishly.

38. But AJ's conduct was not just reckless—it was a direct threat to the survival of Astronaut. His actions undermined the company's financial integrity and violated every principle of fiduciary responsibility.

39. Between late January and February 2025, Volzer and AJ met several times at Astronaut's newly opened office space in San Francisco's Sales Force Tower, but the damage had already been done.

40. Around March 13, 2025, Volzer further confided in Astronaut's Head of Growth Liang about AJ's misconduct. She recommended speaking with an executive coach about a path forward and expressed her own frustrations with AJ's behavior including his lack of communication, his habit of hiding in hotel rooms during conferences, and his failure to generate any business leads. Liang openly questioned AJ's value to the company.

41. On March 14, 2025, Liang introduced Volzer to an executive coach offering a glimmer of hope that the situation could be salvaged.

42. On March 18, 2025, Volzer met with the coach again and laid bare AJ's financial abuse and lack of contribution. The executive coach affirmed that the situation was serious and that it was understandable that Volzer's trust in AJ had been damaged given the financial abuse. She also noted that if Volzer and AJ wanted to move forward with coaching, AJ would need to be involved.

43. Between April 8 and May 13, 2025, Volzer poured himself into building Astronaut's new product "Supergram." Supergram was a Telegram-based messaging app designed specifically for sales and customer support teams. While Volzer worked tirelessly to complete the Supergram product, AJ remained largely disengaged. Their communication during this time was minimal.

44. Additionally, on April 11, 2025, Volzer reached out to Anthropic, a research company developing safe and secure AI. Volzer sought to compare Anthropic's AI models with OpenAI's models to assess the potential usage at Astronaut.

45. From May 13 to May 16, 2025, Volzer, Liang, and AJ attended the Consensus 2025 Conference in Toronto. Volzer attended, in part, to observe what AJ actually did at these conferences. Volzer had never been to a conference with AJ before and did not have firsthand experience to confirm or refute Liang's concern about AJ staying in his hotel.

46. Liang's past observations proved true. AJ did not attend a single session. Though he did make an appearance on the last day to take a photograph with Volzer and Liang. Liang confided to Volzer that AJ had done the same at a previous conference in Dubai in April 2025—burning through $8,000 to $10,000 for a closed-door trip that produced no business value.

47. In a pivotal meeting in Oakland on May 19, 2025, Volzer confronted AJ. In a conversation lasting over three hours, Volzer laid bare the damage AJ's financial misconduct had inflicted—not just on their partnership and trust, but on the company's viability. Volzer demanded accountability and that the two work together with an executive coach to salvage what remained, otherwise Volzer was not willing to continue. AJ scoffed, dismissing the idea of working with a coach to repair the relationship and declaring that unless **Volzer** was "fully committed," there was no point. As Volzer detailed the company's dire financials—$70,000 burned monthly against a meager $2,000 in revenue—AJ revealed his true priorities: personal influence. He idolized convicted felons like Arthur Hayes and P. Diddy, justifying his reckless spending and wasted meetings/conferences as a means to expand his influence network. The meeting ended late, unresolved, with plans to continue the next day.

48. The following afternoon, May 20, 2025 at Salesforce Park, Volzer made it clear that their working relationship was untenable. AJ refused to resign, and Volzer, unwilling to abandon the company he helped build, rejected the idea of himself stepping down. They agreed to pursue a negotiated separation agreement and present a unified proposal to the board—though AJ's resistance to accountability was already casting doubt on his sincerity.

49. The next day, May 21, 2025, Volzer requested access to the company's Carta system, a necessary step in evaluating his equity and formalizing the separation. The Carta system was a cap table management software, that enabled AJ to receive and distribute financial documents. Specifically, it contained data about Volzer's outstanding shares and vested shares. AJ eventually granted access.

50. During a brief meeting on May 24, 2025, Volzer proposed a buyout of his shares at a fair valuation—somewhere between the 409A valuation and the priced round. AJ responded with denial, falsely claiming Volzer held only options and no actual shares. The conversation went nowhere. Volzer suggested they involve legal counsel to move forward.

51. AJ next backtracked on May 28, 2025, admitting that Volzer did, in fact, own shares. He offered to buy the vested portion at the 409A valuation which meant he was offering about $.04 per share, putting the company's total value at approximately $550,000. However, just

several months prior, Astronaut sold shares at a valuation of about $10.5 million. Clearly, AJ's offer was a lowball figure that grossly undervalued Volzer's contributions. Once again, Volzer declined and reiterated his proposal for a fair valuation or legal negotiation.

52. Their next phone call, on June 5, 2025, was a repeat of AJ's same inadequate offer. Volzer stood firm, insisting that the matter be handled through counsel.

53. Meanwhile, Volzer continued to deliver value. On June 2, 2025, he submitted a research report to AI behemoth Anthropic, followed by a detailed follow-up on June 5, 2025—work he had been developing since the confrontation with AJ on May 19, 2025. To conduct the research study, Volzer designed scripts, prepared training data, and established a research protocol. In exchange for financial support from Anthropic, Volzer delivered an eight-page report titled *"Comparative Analysis of LLM Performance and Cost-effectiveness in Classification Tasks."* As part of the collaboration, Volzer executed a deal wherein Anthropic agreed to subsidize both the experimental costs and Astronaut's ongoing production expenses.

54. On June 10, 2025, AJ texted Volzer to schedule a meeting under the guise of discussing updates.

55. On June 11, 2025, AJ's intent to retaliate and lie about Volzer became manifest. AJ sent Volzer an email falsely claiming Volzer had agreed to resign on May 19. He demanded a resignation letter and immediate transfer of services and infrastructure. Without board approval, AJ began purging Volzer from company systems—Gusto, Mercury, Slack, GitHub—effectively erasing him from Astronaut.

56. During the week of June 11, 2025, Liang informed Volzer that AJ had told her he fired Volzer for not writing code—a blatant lie, especially given Volzer's recent product development and research contributions.

57. In response to AJ's June 11, 2025 email, Volzer clarified on June 12, 2025 that he had never agreed to resign. He reiterated that the May 19, 2025 meeting focused on AJ's misuse of funds and again requested that their lawyers be connected.

58. AJ doubled down on June 13, 2025, scheduling a special board meeting with the sole agenda of terminating Volzer. That same day, Volzer sent AJ an email demanding a fair

resolution, attaching screenshots of AJ's spurious expenses to underscore the seriousness of the misconduct. He also warned that AJ's reckless removal of access had broken Astronaut's only existing product, an analytics tool for online communities. By removing Volzer's accounts from the various systems, AJ broke permission access that subsequently prevented the system from working correctly. As a result, none of Astronaut's customers could use the product.

59. Later that day, AJ called Volzer in a bizarre attempt to "befriend" him, suggesting drinks once the dust settled. He claimed to "respect" Volzer now that Volzer exposed AJ's financial abuse and actually possessed the incriminating evidence against him. But AJ then offered the same lowball deal—this time with a consulting agreement dangled. Volzer declined.

60. On June 14, 2025, Volzer proposed a buyout for all his shares—vested and unvested—at a valuation between the 409A and the priced round. AJ refused, prompting Volzer to insist that lawyers take over negotiations.

61. AJ canceled the special board meeting on June 16, 2025, claiming that counsel would now handle the separation. But the obstruction continued.

62. By June 24, 2025, Astronaut's counsel Jonathan Chan sent Volzer's attorney, Jonathon Vinocur, the same inadequate agreement AJ had proposed ten days earlier. Chan mentioned an internal investigation, but Volzer was never invited to participate—despite being the whistleblower prompting it and despite his lawyer expressly requesting that he be involved.

63. When Vinocur followed up on June 27, 2025, Chan amazingly questioned the relevance of the investigation to Volzer's transition. Vinocur responded bluntly: Volzer would not be forced into a separation if not for AJ's misconduct.

64. On July 1, 2025, Susannah Howard, an employment attorney representing Astronaut, contacted Vinocur to discuss Volzer's separation. In their exchanges, Howard questioned the relevance of the expenses review and provided a list of Volzer's work product—including services and code—that needed to be transferred.

65. Volzer complied on July 2, 2025, transferring all services, code, and other work product to Astronaut. He coordinated with AJ via Telegram and documented everything for counsel.

66. Weeks later, on July 17, 2025, Chan sent the accounting firm's review. It was a superficial examination of only 2025 expenses and checking account statements. Though Volzer's exposé of AJ's financial abuses concerned only 2024 expenses, the "investigation" tellingly avoided any inquiry into that time period.

67. The fallout continued. On July 23, 2025 influential Board member Clarence Bethea resigned from Astronaut's board.

68. Then came July 24, 2025—a surreal moment in AJ's unraveling. AJ called Volzer, sobbing on the phone as he confessed to the damage he had caused. He admitted to hurting people, tarnishing reputations, and dragging down the very investors who had placed their trust in him. He lamented the stain he had left on their investors' reputations, on South Loop Ventures' first investment, and on Astronaut's angel backers. In a bizarre twist, AJ begged Volzer to name his terms, promising to "make it happen." Volzer, stunned by the emotional collapse, responded with clarity and resolve: AJ needed to resign. Volzer offered to take the reins and restore the company's value. AJ said he would consider it and that he would get back to Volzer in the following days—but the call ended without commitment, leaving Volzer in limbo and the company hanging by a thread.

69. By July 28, 2025, Volzer had followed up via text, warning that he would contact his lawyer if AJ didn't respond. Silence followed.

70. On July 31, 2025, AJ once again about-faced and delivered the final blow—an abrupt email terminating Volzer, devoid of explanation, justification, or even basic decency. No cause was cited. No rationale offered. Just a cold demand that Volzer return all company property and a notice that Astronaut would repurchase his unvested shares for a total of $24.17.

71. After weeks of gaslighting, manipulation, and obstruction, AJ made his move: he forced Volzer out of the very company he had built from the ground up. The retaliation wasn't subtle—it was calculated albeit ham-fisted, vindictive, and complete.

///

///

///

## FIRST CAUSE OF ACTION

### (Retaliation in Violation of Labor Code § 1102.5)

### (As to All Defendants)

72. Volzer realleges and incorporates by reference each and every allegation above, as though fully set forth herein.

73. Volzer was employed by Defendant Astronaut and served as a co-founder and executive leader.

74. As detailed above, during his tenure, Volzer discovered that Defendant AJ, acting on behalf of Astronaut, had engaged in glaring financial misconduct, including personal purchases using company funds, wasteful and suspicious business expenditures, and destructive spending patterns that threatened the financial integrity of the company.

75. Volzer disclosed this misconduct to multiple individuals with authority within the company, including Victoria Liang, Head of Growth. Plaintiff also raised these concerns directly with AJ in a series of meetings beginning in January 2025 and continuing through June 2025.

76. Volzer had reasonable cause to believe that AJ's conduct constituted violations of state and federal laws governing corporate governance, fiduciary duty, and financial accountability.

77. Volzer's disclosures were made to individuals with authority to investigate, discover, and correct such violations, and were protected under Labor Code § 1102.5.

78. Following these disclosures, AJ—acting on behalf of Astronaut—initiated a campaign of retaliation against Volzer. This included:
   a. Falsely claiming Volzer had agreed to resign;
   b. Unilaterally removing Volzer from company systems and infrastructure;
   c. Scheduling a board meeting to terminate Volzer;
   d. Refusing to engage in good faith negotiations regarding Volzer's equity;
   e. Lying to company insiders about Volzer being terminated for performance issues; and
   f. Ultimately terminating Volzer via email on July 31, 2025, without cause or explanation.

79. Volzer's protected disclosures were a contributing factor in Defendants' decision to

terminate his employment and strip him of access, authority, and equity in the company.

80. As a direct and proximate result of Defendants' retaliatory conduct, Volzer suffered substantial harm, including loss of employment, reputational damage, emotional distress, and financial injury.

81. Defendants' conduct was committed maliciously, fraudulently or oppressively with the intent of injuring Volzer, and/or with a willful and conscious disregard of Volzer's right to work in an environment free from retaliation. Because these acts were carried out by Defendants and Does 1 through 50, inclusive, and managerial employees in a despicable, deliberate and intentional manner, Volzer is entitled to recover punitive damages in a sum sufficient to punish and deter future conduct.

## SECOND CAUSE OF ACTION

### (Wrongful Termination in Violation of Public Policy)

### (As to All Defendants)

82. Volzer realleges and incorporates by reference each and every allegation above, as though fully set forth herein.

83. Volzer was employed by Defendant Astronaut as a co-founder and executive leader.

84. On or about July 31, 2025, Defendant Astronaut, through its agent Defendant AJ, terminated Volzer's employment via email. The termination was abrupt, unexplained, and followed a series of retaliatory actions including removal of Volzer from company systems, exclusion from decision-making, lies about Volzer's job performance and denial of equity rights.

85. The termination was substantially motivated by Volzer's refusal to remain silent about Defendant AJ's unlawful conduct and financial improprieties. Volzer repeatedly raised concerns about Defendant AJ's misuse of company funds—including personal purchases, wasteful travel, and fraudulent reimbursements—and demanded accountability. These disclosures were made to individuals with authority within the company and were protected under California law and public policy.

86. Volzer had reasonable cause to believe that Defendant AJ's conduct violated state

and federal laws governing corporate governance, fiduciary duty, and financial integrity. His refusal to condone or participate in these violations, and his insistence on transparency and legal compliance, were substantial motivating reasons for his termination.

87. As a result of the termination, Volzer suffered harm, including loss of employment, income, equity, and professional reputation. The discharge was a substantial factor in causing this harm.

88. Defendant Astronaut's conduct violated fundamental public policy, including the policy embodied in California Labor Code § 1102.5, which protects employees from retaliation for reporting suspected illegal activity. The termination also contravened the public's interest in lawful corporate conduct and accountability.

89. Defendants' conduct was committed maliciously, fraudulently or oppressively with the intent of injuring Volzer, and/or with a willful and conscious disregard of Volzer's right to work in an environment free from retaliation. Because these acts were carried out by Defendants and Does 1 through 50, inclusive, and managerial employees in a despicable, malicious and intentional manner, Volzer is entitled to recover punitive damages in a sum sufficient to punish and deter similar future conduct.

90. Volzer is entitled to attorney's fees and costs under California Code of Civil Procedure section 1021.5 because: (a) this action confers a significant benefit to the general public or a large class of persons impacted by the practices alleged herein, (b) the necessity and financial burden of private enforcement makes the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery to Volzer.

## THIRD CAUSE OF ACTION

**(Negligent Hiring, Retention, and Supervision)**

**(As to Defendant Astronaut, Inc.)**

91. Volzer realleges and incorporates by reference each and every allegation above, as though fully set forth herein.

92. Defendant Astronaut hired Defendant AJ as a co-founder and executive with substantial control over company finances, operations, and personnel.

93. Defendant AJ was unfit and incompetent to perform the duties for which he was hired. His conduct included repeated misuse of company funds for personal purchases, reckless and wasteful spending, and retaliatory behavior toward Volzer when confronted about his misconduct.

94. Defendant Astronaut knew or should have known that Defendant AJ was unfit to serve in a fiduciary and leadership role. Defendant AJ's behavior was not isolated—it was persistent, well-documented, and known to other executives. Despite this, Defendant Astronaut failed to take corrective action, failed to supervise Defendant AJ's conduct, and retained him in a position of unchecked authority.

95. Defendant AJ's unfitness and incompetence directly harmed Volzer. Defendant AJ retaliated against Volzer for raising concerns about financial misconduct, removed him from company systems, misrepresented the basis his termination, and ultimately terminated him without cause. These actions caused Volzer to lose his position, income, equity, and professional reputation.

96. Defendant Astronaut's negligence in hiring, retaining, and supervising Defendant AJ was a substantial factor in causing Volzer's harm. The company's failure to act on clear warning signs and its decision to empower Defendant AJ despite his misconduct created a foreseeable and preventable risk that ultimately materialized.

97. Defendants' conduct was committed maliciously, fraudulently or oppressively with the intent of injuring Volzer, and/or with a willful and conscious disregard of Volzer's right to work in an environment free from retaliation. Because these acts were carried out by Defendants and Does 1 through 50, inclusive, and managerial employees in a despicable, malicious and intentional manner, Volzer is entitled to recover punitive damages in a sum sufficient to punish and deter similar future conduct.

**FOURTH CAUSE OF ACTION**

**(Intentional Infliction of Emotional Distress)**

**(As to Defendant AJ)**

98. Volzer realleges and incorporates by reference each and every allegation above, as

though fully set forth herein.

99. Defendant AJ engaged in a sustained pattern of outrageous conduct directed at Volzer, including financial misconduct, gaslighting, manipulation, and retaliatory termination. Defendant AJ falsely claimed both that Volzer had resigned and been terminated for (baseless) performance issues, removed him from company systems, sabotaged his access to infrastructure, and ultimately terminated him without cause—all while refusing to engage in good faith negotiations and ignoring repeated requests for resolution.

100. Defendant AJ's conduct was not only intentional—it was calculated to inflict emotional harm. Defendant AJ knew Volzer was present and directly affected by these actions, and he acted with reckless disregard for the emotional toll his behavior would cause.

101. As a result of Defendant AJ's conduct, Volzer suffered severe emotional distress. The betrayal by a business partner, the loss of a company he helped build, and the malicious nature of the termination caused Volzer significant anguish, anxiety, and reputational harm.

102. Defendant AJ's outrageous conduct was a substantial factor in causing Volzer's emotional distress. The cumulative effect of AJ's actions—ranging from financial abuse to personal manipulation—exceeded all bounds of decency tolerated in a civilized society.

103. Defendants' conduct was committed maliciously, fraudulently or oppressively with the intent of injuring Volzer, and/or with a willful and conscious disregard of Volzer's right to work in an environment free from retaliation. Because these acts were carried out by Defendants and Does 1 through 50, inclusive, and managerial employees in a despicable, malicious and intentional manner, Volzer is entitled to recover punitive damages in a sum sufficient to punish and deter similar future conduct.

104. Volzer is entitled to attorney's fees and costs under California Code of Civil Procedure section 1021.5 because: (a) this action confers a significant benefit to the general public or a large class of persons impacted by the practices alleged herein, (b) the necessity and financial burden of private enforcement makes the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery to Volzer.

///

## **PRAYER FOR RELIEF**

WHEREFORE, Volzer prays for relief against Defendants, and each of them as follows:

1. Economic and non-economic damages suffered, including but not limited to lost wages, lost equity, lost benefits, and reputational harm resulting from the retaliatory termination, negligent supervision, and intentional misconduct.

2. Damages arising from severe emotional distress, mental anguish, and suffering caused by Defendant AJ's outrageous and retaliatory conduct, including his manipulation, gaslighting, false statements about Volzer's performance and abrupt termination of Volzer from the company he helped build.

3. Punitive damages against Defendants, whose conduct was malicious, oppressive, and carried out with conscious disregard for Volzer's rights and emotional well-being.

4. Declaratory relief establishing that Volzer's termination was unlawful and violated California's public policy and whistleblower protections under Labor Code § 1102.5.

5. Equitable relief including reinstatement of Volzer's equity rights, correction of corporate records, and any other measures necessary to restore his professional standing and contributions to Astronaut, Inc.

6. Attorneys' fees and costs incurred in pursuing this action, as permitted by applicable statutes and common law, including California Labor Code § 1102.5 and Code of Civil Procedure § 1021.5.

7. Prejudgment interest on all amounts at the maximum legal rate;

8. Interest at the maximum legal rate from the date judgment is entered until judgment is paid in full;

9. Such other and further relief at law and in equity as the Court deems just and proper; and

10. Jury trial on all issues.

///

///

1  DATED: September 15, 2025                HANSON BRIDGETT LLP

                                            By: ___/s/ Matthew Miller_____
                                                MATTHEW F. MILLER
                                                BREANA L. BURGOS
                                                Attorneys for Plaintiff CHRIS VOLZER